**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

NICOLE FLICK,

Plaintiff,

v.

M.I. INDUSTRIES, INC., d/b/a INSTINCT PET FOODS,

Defendant.

Case No. 26-cv-01470-BAS-AHG

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS (ECF No. 23)**

Plaintiff Nicole Flick brings a putative class action against Defendant M.I. Industries, Inc., d/b/a Instinct Pet Foods ("Instinct"), seeking relief under several California consumer protection statutes and common law causes of action. (ECF No. 22 ("First Amended Complaint" or "FAC").)

Presently before the Court is Defendant's motion to dismiss Plaintiff's First Amended Complaint for failure to state a claim. (ECF No. 23 ("Mot.").) Plaintiff filed an opposition (ECF No. 24 ("Opp'n")), and Defendant replied (ECF No. 25 ("Reply")). The Court finds Defendant's motion suitable for determination on the papers submitted. *See* Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1). For the reasons that follow, the Court **DENIES** the motion.

# I. BACKGROUND

This case centers around alleged misrepresentations made by Defendant to consumers regarding its use of artificial preservatives. Instinct sells three lines of dog food: Original Recipe, Raw Meals, and Raw Boost Mixers (together, the "Products"). (*See* FAC ¶ 15.) In each of the Products, Defendant makes a representation regarding the use of artificial ingredients. On the Original Recipe bag, Instinct represents the food was "Made Without . . . artificial colors or preservatives." (*Id.*) On the Raw Meals bag, Instinct similarly represents the food is "free from . . . artificial preservatives." (*Id.*) Lastly, the Raw Boost Mixers bag claims the food is "all natural" and contains "nothing artificial." (*Id.*) According to the FAC, these representations are false. (*Id.* ¶ 16.) The Products contain either mixed tocopherols or a combination of mixed tocopherols and citric acid—both ingredients constituting artificial preservatives as used in Defendant's manufacturing processes. (*Id.*)

The Products are part of a rapidly growing market for "clean label" pet foods in the United States and across the world. (*Id.* ¶ 46.) "Clean label" refers to pet foods free of artificial or chemically synthesized ingredients. (*Id.*) The growing demand is driven by pet humanization, growing awareness of pet wellness, demand for transparency in ingredient sourcing generally, and the proliferation of premium and "clean label" pet food brands. (*Id.*) The market for "clean label" pet foods is expected to grow to around $23 billion annually by 2030, a jump from about $14 billion in 2025. (*Id.* ¶ 47.)

Plaintiff is a part of the growing class of consumers seeking out "clean label" pet foods and relied on Defendant's representations in purchasing one of the Products. (*See id.* ¶¶ 48–49.) She purchased Original Recipe dog food on June 6, 2025, from Amazon.com. (*Id.* ¶ 1.) Plaintiff reviewed and relied on Instinct's allegedly false label statement ("Made Without . . . artificial colors or preservatives") in making her purchase. (*See id.* ¶¶ 15–17.) Believing her consumer rights were violated, Plaintiff sued Instinct in federal court on March 9, 2026. (ECF No. 1.) Plaintiff seeks to represent a class of "all consumers in the State of California who purchased the Products within four years prior to the filing of the

original Complaint in this matter." (FAC ¶ 50.) Plaintiff claims, had she known the truth about the artificial status of certain ingredients in the Products, she would have never purchased one or would have only been willing to pay a substantially reduced price for it. (*Id.* ¶ 49.)

**A. The Ingredients' Manufacturing Processes**

Virtually all citric acid in commercial food production in the United States is produced through a "multi-step industrial manufacturing process, not by extraction from any natural source." (*Id.* ¶ 19.) Citric acid is not always artificial—there is a natural form of it extracted from fruit. (*Id.* ¶ 18.) However, the use of naturally produced citric acid for commercial food production is "prohibitively expensive." (*Id.*) Approximately 99% of the world's supply of citric acid is carried out using the fungus *Aspergillus niger*. (*Id.*)

The modern production of citric acid begins with glucose, often derived from genetically modified corn. (*Id.* ¶ 20.) The glucose is first fermented with *Aspergillus niger* in large-scale bioreactors, which creates a fermentation liquor that is then chemically precipitated with calcium hydroxide to form calcium citrate. (*Id.*) The calcium citrate is then reacidulated with sulfuric acid and crystallized into a refined citric acid. (*Id.*) Chemical substances such as n-octyl alcohol and synthetic isoparaffinic petroleum hydrocarbons are used to extract the citric acid from the *Aspergillus niger* fermentation liquor. (*Id.*) These chemical substances "frequently survive the reacidulation process in fragmentary form." (*Id.*) This multi-step process, Plaintiff alleges, contains the "classic hallmarks of synthetic manufacture, not natural derivation." (*Id.* ¶ 21.) As used by Instinct in its Products, this form of citric acid is used to prevent or delay deterioration of the Products. (*See id.* ¶ 24.)

The tocopherols used in Instinct's Products are allegedly artificial as well. Tocopherols are "fat-soluble compounds that are present in Vitamin E and possess antioxidant properties. In foods, added tocopherols are commonly used to inhibit oxidation and delay rancidity, thereby extending shelf life and maintaining freshness." (*Id.* ¶ 28.) This function is especially important in dry pet foods, which commonly contain animal fats and other ingredients that can oxidize and spoil during storage. (*Id.* ¶ 32.) Tocopherols used

in commercial food preparation are commonly supplied in concentrated form using a blend of tocopherol compounds, referred to as "mixed tocopherols." (*Id.* ¶ 29.) Commercially available mixed tocopherol preservative systems are "chemically synthesized through substantial industrial extraction, concentration, purification, distillation, and/or synthesis processes and are supplied as separate commercial ingredients for incorporation into food products." (*Id.* ¶ 35.) Mixed tocopherols are different from naturally occurring tocopherols present in whole-food ingredients because they are intentionally introduced as preservatives to maintain freshness and prevent rancidity. (*Id.* ¶¶ 30–31.) Some components of mixed tocopherol compounds used in the Products derive from petrochemical feedstock sources. (*Id.* ¶ 34.) Like artificial forms of citric acid, mixed tocopherols produced by chemically synthetic processes come at a significantly lower cost compared to extraction from natural sources. (*See id.* ¶ 37.) As a result, tocopherols used as preservatives in pet food are "nearly universally chemically synthesized, rather than derived from natural sources." (*Id.*) Instinct confirms the use of mixed tocopherols as preservatives on the Products' ingredient panel, stating they are used to "preserve freshness." (*Id.* ¶ 33.)

## II. LEGAL STANDARDS

### A. Motion to Dismiss

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A Rule 12(b)(6) motion tests that standard by seeking dismissal for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

To survive a motion to dismiss, a complaint must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While legal conclusions may provide the framework of a complaint, "they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The plaintiff must plead "factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged"—in other words, enough to render the claim plausible. *Id*. at 678 (citing *Twombly*, 550 U.S. at 570). In ruling on a motion to dismiss, the court accepts the complaint's factual allegations as true and construes the pleadings in the light most favorable to the nonmoving party. *See Manzarek v. St. Paul Fire & Marine Ins. Co*., 519 F.3d 1025, 1031 (9th Cir. 2008). The court may not look beyond the complaint. *See United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).

If dismissal is warranted, the court considers whether to grant leave to amend. Leave should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). At the same time, "a district court may dismiss without leave where a plaintiff's proposed amendments would fail to cure the pleading deficiencies and amendment would be futile." *Cervantes v. Countrywide Home Loans, Inc*., 656 F.3d 1034, 1041 (9th Cir. 2011). "[T]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Metzler Inv. GMBH v. Corinthian Colls., Inc*., 540 F.3d 1049, 1072 (9th Cir. 2008) (quotation omitted).

**1. Heightened Pleading Standard for Fraud-Based Claims**

Where a plaintiff alleges claims sounding in fraud, she must "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *See* Fed. R. Civ. P. 9(b). "Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (citation modified). Allegations of fraud must be stated with "specificity including an account of the 'time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)). Rule 9(b) applies in cases regardless of the basis for subject matter jurisdiction or whether the substantive law in question is derived from state

or federal authority. *See Kearns*, 567 F.3d at 1125 (holding that Rule 9(b) applies to claims brought under California consumer protection statutes).

## III. ANALYSIS

### A. CLRA, UCL, and FAL (Counts I, IV–VII)

Five of Plaintiff's causes of action arise from a trio of California consumer protection statutes: the Consumers Legal Remedies Act ("CLRA"), the Unfair Competition Law ("UCL"), and the False Advertising Law ("FAL"). Because all of these claims are governed by the same "reasonable consumer" standard, the Court considers them together. *See Tarvin v. Olly Pub. Benefit Corp.*, 756 F. Supp. 3d 797, 803 (C.D. Cal. 2024) (considering CLRA, UCL, and FAL claims together under the reasonable consumer standard); *see also McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1097 (9th Cir. 2023).

Under the reasonable consumer standard, plaintiffs must "show that members of the public are likely to be deceived." *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (citation modified). The California Supreme Court recognizes "that these laws prohibit 'not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood, or tendency to deceive or confuse the public.'" *Id.* (quoting *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002)). The standard "requires more than a mere possibility that [the product advertising] 'might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner,'" but rather "'that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) (quoting *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003)). The "touchstone" of the reasonable consumer standard is whether the product marketing has "a meaningful capacity to deceive consumers." *McGinity*, 69 F.4th at 1097. Whether a reasonable consumer may be deceived by product marketing "often raises questions of fact" and therefore it is "generally not appropriate for resolution on a motion to dismiss except in rare situations where the alleged violations of

UCL, FAL, and CLRA are simply not plausible." *Tarvin*, 756 F. Supp. 3d at 803 (collecting cases) (citation modified).

The Court finds that this case does not present a "rare situation" where alleged violations of California consumer protection statutes should be resolved at the pleading stage. "California courts . . . have recognized that whether a business practice is deceptive will usually be a question of fact not appropriate for decision" at the pleading stage. *Williams*, 552 F.3d at 938; *see, e.g.*, *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 134–35 (2007) ("Whether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires consideration and weighing of evidence from both sides and which usually cannot be made on demurrer." (citation modified)). Defendant's arguments to the contrary are unavailing. The Court analyzes each in turn.

**1. Whether the FAC Plausibly Pleads the Products' Labels are False or Misleading**

Defendant first argues the FAC fails to plausibly allege the key predicate to the deception behind each count: that citric acid and mixed tocopherols are "artificial preservatives." (Mot. at 9.) Instinct claims the FAC pleads only that those ingredients are "chemical preservatives" under 21 C.F.R. § 101.22(a)(5), arguing that a "chemical preservative is not the same as an artificial preservative." (*Id.*) However, as Plaintiff points out, the FAC repeatedly and directly alleges the ingredients are artificial. She describes in detail the artificial processes used to synthesize the overwhelming amount of citric acid and mixed tocopherols destined for use in American commercial food production. (*See* FAC ¶¶ 18–39.)

Plaintiff's citric acid allegations are not, as Defendant claims, "self-defeating." (*See* Mot. at 10.) Defendant contends the U.S. Department of Agriculture's ("USDA") National Organic Program (the "Program") lists citric acid as one of the "non-synthetics" allowed in organic products. (Mot. at 10) (citing 7 C.F.R. § 205.605(a)(1)). The Program's regulations define "nonsynthetic" as synonymous with "natural." 7 C.F.R. § 205.2. Citric acid is listed in the regulations as a "nonsynthetic[] allowed" as an ingredient "in or on"

processed products labeled as "organic" where it is "produced by microbial fermentation of carbohydrate substances[.]" *See* 7 C.F.R. § 205.605(a)(1). Defendant therefore claims the microbial fermentation of glucose (a carbohydrate) using *Aspergillus niger* described in the FAC is "precisely the process federal law classifies as non-synthetic." (*See* Mot. at 10.)

The regulations are not quite so black and white. The "nonsynthetic" type of citric acid specifically allowed under the regulations is one described as "produced by microbial fermentation of carbohydrate substances[.]" 7 C.F.R. § 205.605(a)(1). As Plaintiff points out, the FAC alleges fermentation on top of a series of artificial processes: chemical precipitation with calcium hydroxide; reacidulation with sulfuric acid; crystallization into refined citric acid; and extraction with two chemical solvents (n-octyl alcohol and synthetic isoparaffinic petroleum hydrocarbons) to ultimately extract the citric acid from the *Aspergillus niger* fermentation liquor. (*See* FAC ¶ 20.) Instinct collapses the processes into one suggesting compliance with the standard set out in 7 C.F.R. § 205.605(a)(1) when it does not appear to be so simple.

The Program's other definitions indicate dismissal is improper at the pleading stage because it is a question of fact as to whether the citric acid used by Instinct is either "synthetic" or "nonsynthetic." These terms are defined by the Program as:

> Synthetic. A substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally occurring biological processes.
>
> Nonsynthetic (natural). A substance that is derived from mineral, plant, or animal matter and does not undergo a synthetic process as defined in section 6502(21) of the Act (7 U.S.C. § 6502(21)).[1]

[1] Though the text of the regulation points to 7 U.S.C. § 6502(21), that portion of the statute discusses the meaning of the term "State organic certification program." *See* 7 U.S.C. § 6502(21). The very next provision defines "synthetic" as "a substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally

> For the purposes of this part, nonsynthetic is used as a synonym for natural as the term is used in the Act.

7 C.F.R. § 205.2.

Taking the well-pleaded allegations in a light most favorable to Plaintiff as the non-movant, the Court finds the FAC plausibly pleads that both citric acid and mixed tocopherols—as used in Instinct's Products—are artificial preservatives. As an initial observation, sharing a name with a substance appearing on the 7 C.F.R. § 205.605(a) list of "nonsynthetics allowed" does not automatically mean the particular substance challenged is natural or nonsynthetic as a matter of law. Plaintiff alleges a detailed, chemically intensive artificial process for the development of 99% of the world's supply of citric acid. (*See* FAC ¶¶ 18–27.) This alleged process is significantly different than the citric acid "produced by microbial fermentation of carbohydrate substances" contemplated by the relevant regulations. *See* 7 C.F.R. § 205.605(a)(1). Moreover, if Instinct's particular formulation of citric acid is synthetic because it is "formulated or manufactured by a chemical process . . . that chemically changes a substance extracted from naturally occurring" matter, *see* 7 C.F.R. § 205.2, then that *particular version* of citric acid would be entirely removed from the ambit of 7 C.F.R. § 205.605(a)(1) because by definition it cannot be a "nonsynthetic." Whether Instinct's manufacturing processes indeed cross the line from "nonsynthetic" to "synthetic" is a question of fact the Court cannot resolve on the pleadings.

Defendant accuses Plaintiff of making a legal conclusion as to the use of artificial citric acid in its Products. (*See* Mot. at 11.) Not so. The FAC pleads "[v]irtually all citric acid used in U.S. commercial food—including that used in the Products—is produced through a multi-step industrial manufacturing process, not by extraction from any natural source." (FAC ¶ 19.) It is reasonable to infer, given the overwhelming use of artificially

occurring biological processes." *See* 7 U.S.C. § 6502(22). This provision is identical to the definition of "synthetic" provided by 7 C.F.R. § 205.2.

produced citric acid in the relevant industry, that Instinct does the same as the vast majority of its peers. This is enough at the pleading stage.[2]

The same is true for mixed tocopherols. Defendant claims the FAC is too "conclusory and generic" to plausibly establish that the tocopherols used in Instinct's Products are artificial. (Mot. at 10.) The Court finds otherwise. Like with citric acid, Plaintiff pleads a detailed, artificial, and chemically heavy process designed to produce tocopherols for use as preservatives in American commercial food preparation. (*See* FAC ¶¶ 28–39.) Defendant takes issue with the FAC's apparent gap between how artificial tocopherols are "commonly made" compared to whether the tocopherols in its Products are actually artificial. (*See* Mot. at 10.) However, in addition to the detailed description of tocopherol production, the FAC also pleads that "chemical synthesis processes" come at half the cost of natural tocopherol extraction—leading to the artificial version of tocopherols "nearly universally" being used as preservatives in pet foods. (*See* FAC ¶ 37.) On its ingredient panel, Instinct confirms the use of mixed tocopherols to "preserve freshness." (*Id.* ¶ 33.) It is reasonable, considering the near-universal use of artificial tocopherols in commercial food production, to infer Instinct's use of the same based on the pleadings at this stage of the litigation.

Whether the processes used by Instinct result in ingredients that are "synthetic" or "nonsynthetic" under the relevant regulations is a question of fact the Court is not at liberty to resolve at this stage. Having found that Plaintiff plausibly pleads citric acid and mixed tocopherols (as used in Instinct's manufacturing processes) are indeed artificial, the Court turns to whether Plaintiff sufficiently pleads consumer deception.

---

[2] Another court in this district found citric acid to be artificial based on less detailed allegations. For example, a plaintiff's complaint linked citric acid to the defendant's products just three times, which was enough to survive a Rule 12(b)(6) challenge. *See Fried v. Snapple Beverage Corp.*, 753 F. Supp. 3d 1145, 1152 (S.D. Cal. 2024) (Sabraw, J.). The *Fried* plaintiff alleged: (1) manufactured citric acid "which is in the Products, is an industrial chemical derived, not from fruit or vegetables, but from the fermentation of crude sugars . . . by the mold *Aspergillus niger*"; (2) each of the challenged products "contain [manufactured citric acid]"; and (3) the challenged products "contain [manufactured citric acid], an industrial chemical." *See id.* Judge Sabraw found that those allegations were not conclusory and denied the motion to dismiss. *See id.* at 1152–53.

### 2. Whether Plaintiff Adequately Pleads Consumer Deception

Defendant next argues the following to challenge Plaintiff's consumer deception theory: (1) the ingredient list disclosures on its Products defeat Plaintiff's theory; (2) Plaintiff's theory impermissibly requires imputing technical regulatory knowledge to ordinary consumers; and (3) Plaintiff inappropriately lumps together different representations across the Products and treats them as interchangeable. (*See* Mot. at 11–13.) None are persuasive. "It is generally not appropriate" to resolve consumer deception on a motion to dismiss "except in 'rare situations' where the alleged violations of UCL, FAL, and CLRA are simply not plausible." *See Tarvin*, 756 F. Supp. 3d at 803 (collecting authority) (citation modified). This is not one of those rare situations.

#### i. Ingredient List Disclosures Theory

Defendant argues a "reasonable consumer reviewing" the Products' back-panel ingredient list disclosing tocopherols and citric acid would not be deceived because the ingredient list resolves the ambiguity presented by its claim on the Products' front-panel packaging. (*See* Mot. at 11–12) (citing *McGinity*, 69 F.4th at 1098). Defendant's ingredient list argument does not hold water.

Whether a back-label ingredient list cures the tendency of a front-facing label to mislead depends on whether the back-label list conflicts with or confirms a front-label claim. *See McGinity*, 69 F.4th at 1098 (citing *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1017 (9th Cir. 2020)). Where a defendant "commit[s] an act of deception on the front of a product, [] 'the presence of fine print revealing the truth is insufficient to dispel that deception.'" *Id.* (quoting *Ebner*, 838 F.3d at 966). Defendant claims this principle of law does not apply because the Products' misrepresentations are "at most, ambiguous as to whether tocopherols or citric acid qualify as 'artificial preservatives.'" (*See* Mot. at 12.) The Court disagrees. The statements on the Products are unambiguously affirmative representations: Original Recipe affirmatively states "Made Without . . . artificial colors or preservatives"; Raw Meals similarly warrants "free from . . . artificial preservatives"; Raw Boost Mixers clearly represents "nothing artificial." (*See* FAC ¶¶ 15–16.) There is no

nuance to these representations that would make them ambiguous and therefore susceptible to resolution based on back-label ingredients list disclosure. *See McGinity*, 69 F.4th at 1098 ("[T]he front label must be unambiguously deceptive for a defendant to be precluded from insisting that the back label be considered together with the front label." (citation omitted)). The Products' packaging does not say "Made Without Most Artificial Colors or Preservatives" or "Almost Nothing Artificial." The labels say what they say affirmatively and leave no gray areas.

In any event, it does not appear to the Court the back label could cure the misrepresentations on the front label at this stage. The fact Instinct discloses the use of citric acid and tocopherols on its ingredient list does not prevent a reasonable consumer from relying on its front-facing claims regarding its non-use of artificial preservatives because there are naturally occurring forms of both citric acid and tocopherols. (*See* FAC ¶¶ 18, 30.) Thus, reading the ingredients list would only serve to confirm the front-panel claim: a reasonable consumer would, based on the front-panel claim, understand *these versions* of citric acid and tocopherols to be consistent with the front label and therefore not artificial. *See Trammell v. KLN Enters., Inc.*, 176 F.4th 629, 634 (9th Cir. 2026) (reversing CLRA claim dismissal and holding in the back-label ingredient list context "[s]ome ingredients, like 'malic acid,' may come in two forms—natural or artificial. But the list does not say which it is. A reasonable consumer, not being a chemist, is not in a position to make that assessment when buying the Product[s]."); *Williams*, 552 F.3d at 939–40 ("[R]easonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging"); *see also Souter v. Edgewell Pers. Care Co.*, No. 22-55898, 2023 WL 5011747, at *2 (9th Cir. Aug. 7, 2023) ("The ordinary reasonable consumer has very little scientific background" (citation modified)) (mem. disp.). Because the misrepresentations on the Products' packaging are unambiguously deceptive, disclosure on the back-facing ingredients list cannot defeat Plaintiff's consumer deception theory.

**ii. Imputation of Technical Knowledge to the Ordinary Consumer**

Defendant's argument on the imputation of technical regulatory knowledge to ordinary consumers fares no better. Defendant argues the FAC's "deception theory depends on reasonable consumers understanding that tocopherols and citric acid purportedly qualify as 'artificial preservatives' under FDA and USDA classifications, and that those ingredients' presence therefore contradicts the challenged label claims." (*See* Mot. at 12.) The FAC does not assert this theory. Instead, it theorizes ordinary consumers viewing and relying on Defendant's representations regarding its non-use of artificial preservatives (or "nothing artificial" in general) would not expect the ingredients used in the Products to undergo chemically intensive, artificial processes. (*See, e.g.*, FAC ¶¶ 27, 38.) It is a distortion of Plaintiff's theory to claim consumers must be versed in agency definitions of artificial or chemical preservatives in order to be misled. Appropriately framed within the FAC's allegations, it is plausible that a "significant portion of the general consuming public" could be misled by Defendant's misrepresentations regarding artificial preservatives in its Products—no technical or scientific expertise need be imputed to ordinary consumers. *See Ebner*, 838 F.3d at 965.

Defendant also argues Plaintiff's interpretation of the Products' representations is "unreasonable" or "fanciful" because the Products are specialty items whose consumers tend to exhibit a higher standard of care in reviewing labels and ingredients. (Mot. at 13.) However, Plaintiff convincingly argues this theory actually cuts against Defendant. (Opp'n at 14.) A consumer of premium, specialty items who reads labels carefully is one who notices and relies on a product's claim regarding its non-use of artificial preservatives.

**iii. Interchangeability of Misrepresentations**

Defendant's final argument in this area meets the same fate. Instinct contends "Plaintiff cannot lump together different, non-identical label statements across different products and treat them as interchangeable, especially when there is no allegation that this Plaintiff even bought some of the Products." (Mot. at 13.) Defendant quibbles over the slim differences between statements like "nothing artificial," "all natural," and "Made Without

. . . artificial preservatives or colors" but cites no binding or persuasive authority precluding Plaintiff from representing a class of people that bought slightly different products with substantially similar misrepresentations. (*See id.* at 13–14.) The primary case Instinct relies on, *Krommenhock v. Post Foods*, is inapposite. There, the court dismissed a breach of warranty claim in part where "plaintiffs fail[ed] to identify which products contain what warranties," making it "impossible to identify the products that are at issue under this cause of action." *Krommenhock v. Post Foods, LLC*, 255 F. Supp. 3d 938, 966 (N.D. Cal. 2017). The *Krommenhock* court rejected the plaintiff's attempt to piece together a warranty from reading various separate statements together. *See id.* Defendant claims Plaintiff attempts to do the same here by "collecting snippets from multiple packages and treating all statements as interchangeable." (Mot. at 14.)

Here, however, Plaintiff identified specific statements, each independently appearing on the Products' packaging, she contends are false or misleading. (*See* FAC ¶¶ 15–16.) The Court finds that the misrepresentations across each Product—taken together—communicate the same idea: the Products, at a minimum, contain no artificial preservatives and one warrants there is nothing artificial at all.[3]

Taken as a whole, the FAC plausibly pleads the potential for a reasonable consumer to be deceived by Defendant's artificial ingredient misrepresentations in violation of the CLRA, FAL, and UCL. The Court therefore declines to resolve the intensely factual

[3] Defendant challenges Plaintiff's ability to bring claims for products she herself did not purchase. (*See* Mot. at 13, 18–19.) However, the "prevailing view in the Ninth Circuit is that class action plaintiffs can bring claims for products they did not purchase as long as the products and alleged misrepresentations are substantially similar." *See Oh v. Fresh Bellies, Inc.*, No. CV 24-5417 PSG (JPRx), 2024 WL 4500727, at *4 (C.D. Cal. Oct. 15, 2024) (collecting authority) (citation modified). For the reasons stated throughout this order, the Court finds the Products' misrepresentations to be sufficiently similar to permit Plaintiff to proceed with the claims for the unpurchased products at this juncture. Whether it is indeed appropriate for Plaintiff to proceed with claims directed against the unpurchased Products will be determined at the class certification stage.

questions surrounding the reasonable consumer standard at the pleading stage, and **DENIES** Defendant's motion to dismiss Counts I, IV–VII.[4]

**B. Whether Plaintiff Pleads Her Fraud-Based Claims with Specificity**

Defendant claims the FAC independently fails Rule 9(b)'s heightened pleading requirement for Plaintiff's fraud-based claims. (Mot. at 14–16.) Plaintiff does not contest that Rule 9(b) applies. (Opp'n at 15–16.) The Court therefore assumes, without deciding, Rule 9(b) applies to Plaintiff's fraud-based claims.

"Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *See Kearns*, 567 F.3d at 1124 (citation modified). Allegations of fraud must have specificity as to the time, place, and specific content of the false representations together with the identities of the parties to those misrepresentations. *See Swartz*, 476 F.3d at 764 (citing *Edwards*, 356 F.3d at 1066).

Plaintiff has plainly put Defendant on notice of the misconduct she is claiming. Defendant contends Plaintiff either needs to plead much more than Rule 9(b) requires or that Plaintiff has failed to allege facts she did, indeed, plead in her complaint. (*See* Mot. at 15.) The Court declines to impose a higher duty than the one Rule 9(b) places on Plaintiff. Plaintiff pleads with specificity: who made the misrepresentations (Defendant) (FAC ¶¶ 15–16); what misrepresentations were made (Defendant's Products contain nothing artificial or, at a minimum, no artificial preservatives) (*id.*); when Defendant made the misrepresentations (to Plaintiff, via Amazon.com on or about June 6, 2025) (*id.* ¶ 1); where Defendant made the misrepresentations (on the Products' packaging, labeling, and other marketing materials) (*id.* ¶¶ 15–16, 55); and how Defendant was able to convince consumers to purchase its Products, or at least command a higher price on the market (it falsely represented its Products as containing either no artificial ingredients at all or, at a

[4] As Plaintiff plausibly states CLRA and FAL violations, those claims may serve as predicate violations for the UCL's unlawful prong. *See Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 852 (N.D. Cal. 2018). Defendant's motion to dismiss Plaintiff's UCL claim based on the unlawful prong, (Mot. at 20–21), is therefore also denied.

minimum, no artificial preservatives) (*id.* ¶¶ 16, 39, 98, 106, 114, 121). Plaintiff goes on to state Defendant made these misrepresentations to, and misled, both herself and the relevant class of consumers. (*See id.* ¶¶ 27, 38–39, 48–50.) She alleges she reasonably relied on those misrepresentations and that the class would have either paid less for the Products or not purchased any at all. (*Id.* ¶ 49.) The Court cannot conclude, as Defendant asserts, that Plaintiff pleaded broad or conclusory allegations and instead finds Plaintiff pleads her fraud allegations with sufficient specificity.[5]

The Court lastly addresses Defendant's argument based on *Trammell*. Defendant contends the Ninth Circuit's decision in *Trammell v. KLN Enterprises* created a requirement for plaintiffs in California consumer protection cases to conduct laboratory testing on the specific product at issue to confirm their allegations. (*See* Mot. at 15–16) (citing *Trammell*, 176 F.4th at 630–31). Defendant argues the "only" reason *Trammell* reversed dismissal was because the plaintiff there conducted laboratory testing (which Plaintiff here did not). (*See id.*) *Trammell* held no such thing. *Trammell* did not solely rely on the laboratory findings commissioned by the plaintiff to reverse the district court's dismissal of the case. The Ninth Circuit cited other factors—all of which are present here—such as plausibly stating the who, what, when, where, and how of the misconduct charged, in addition to plausibly stating a likelihood of deception. *See Trammell*, 176 F.4th at 632–34. Defendant misreads *Trammell* to establish a rule it did not create. The fact that the

---

[5] The Court also finds that the purposes behind Rule 9(b) are satisfied here. The Ninth Circuit has explained that Rule 9(b) serves three purposes: (1) providing defendants with adequate notice to allow them to defend against charges of fraud and deter pretextual complaints; (2) protecting a defendant's reputation that may be tarnished by a fraud charge; and (3) prohibiting plaintiffs from unilaterally imposing "enormous social and economic costs" upon society, the court, and the parties "absent some factual basis." *Kearns*, 567 F.3d at 1125 (citations omitted). Rule 9(b) in part serves to protect defendants against frivolous or unfounded charges of fraud. *See United States v. Pac. Toxicology Lab'ys*, No. CV 19-2900 MWF (MRWx), 2022 WL 17367186, at *1 (C.D. Cal. Sept. 28, 2022) ("[O]ne purpose of Rule 9(b) is to prevent fishing expeditions." (citation omitted)). The Court concludes that the detailed factual allegations of the FAC are a far cry from the proverbial "fishing expedition" and provide Defendant with adequate notice of the fraud-based claims it is charged with, in satisfaction of the purposes behind Rule 9(b).

*Trammell* court credited plaintiff for buttressing his allegations with laboratory testing does not mandate such testing in future consumer claims under California law. Here, as noted above, it is reasonable to infer Defendant is part of the overwhelming majority of manufacturers that use the artificial versions of citric acid and mixed tocopherols. Thus, the absence of laboratory testing in this matter is not dispositive of the claim as Defendant argues. The Court finds Plaintiff plausibly pleads her fraud-based claims with specificity. Defendant's motion to dismiss the fraud-based claims is therefore **DENIED**.

**C. Whether Plaintiff's Equitable Claims and Remedies are Barred**

Defendant argues Plaintiff's unjust enrichment claim (Count II) and equitable restitution claims (Counts IV–VII) should be dismissed because Plaintiff seeks legal remedies for the same injury, primarily relying on *Sonner v. Premier Nutrition*. (Mot. at 16–18.) In *Sonner*, the Ninth Circuit held that a plaintiff "must establish that she lacks an adequate remedy at law before securing equitable restitution for past harm under the UCL and CLRA." *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (citing *Mort v. United States*, 86 F.3d 890, 892 (9th Cir. 1996)).

*Sonner* does not mandate dismissal of Plaintiff's equitable claims and remedies at this stage of the litigation. The *Sonner* plaintiff—on the eve of trial and after years of litigation—"voluntarily dismissed her sole state law damages claim and chose to proceed with only state law equitable claims for restitution and injunctive relief" to avoid a jury trial. *See id.* at 837. The Ninth Circuit affirmed the district court's dismissal of the plaintiff's equitable restitution claims under the UCL and CLRA in part because of her concession that she sought "the same sum in equitable restitution as a full refund of the purchase price . . . as she requested in damages to compensate her for the same past harm," and because she failed to explain how that same amount of money for the same exact harm was "inadequate or incomplete." *See id.* at 844. While the Ninth Circuit later clarified "[n]othing in *Sonner*'s reasoning suggested that its holding was limited to cases in which a party had voluntarily dismissed a damages claim to avoid a jury trial," *Guzman v. Polaris Indus., Inc.*, 49 F.4th 1308, 1313 (9th Cir. 2022), some district courts in this circuit have

since concluded *Sonner* is of minimal importance at the pleading stage. *See, e.g.*, *Rabin v. Google LLC*, 725 F. Supp. 3d 1028, 1032 (N.D. Cal. 2024) (denying motion to dismiss equitable claims and holding "at this stage, a plaintiff need not explain in great detail why her legal remedies are insufficient; an allegation to that effect is generally enough" (citation modified)); *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1023 (N.D. Cal. 2024) (same); *see also Garland v. Duane Morris LLP*, No. 24-cv-01783-CAB-DEB, 2025 WL 2200732, at *4–5 (S.D. Cal. Aug. 1, 2025) (denying motion to dismiss and finding *Sonner* does not bar plaintiff from pleading equitable claim in the alternative even where it was "for the same amounts" as a legal claim under the California Labor Code).

The Court recognizes there is an intra-circuit split on how exacting a standard *Sonner* imposes on a plaintiff's equitable and legal claims at the pleading stage, even after *Guzman*'s clarification of its scope. *See Barton v. Procter & Gamble Co.*, 766 F. Supp. 3d 1045, 1067 (S.D. Cal. 2025). The viability of certain equitable claims, therefore, hinges on a district court's interpretation of *Sonner*. *Compare Carbine v. Target Corp.*, No. CV 24-03721-MWF (AJRx), 2025 WL 501829, at *6 (C.D. Cal. Feb. 13, 2025) (denying motion to dismiss and finding the "better of the argument" on this intra-circuit split to be "that a plaintiff may pursue a claim for equitable relief in the alternative at the pleading stage" (collecting authority)), *with Urbina v. Sunnyvalley Smoked Meats, Inc.*, No. 25-cv-02151-TLN-AC, 2026 WL 2824725, at *3–4 (E.D. Cal. Sept. 21, 2026) (taking the opposing position and dismissing equitable UCL claim without leave to amend). The Court adopts the reasoning of the *Carbine* line of cases. Plaintiff here has pleaded why she believes she lacks an adequate remedy at law. (*See* FAC ¶¶ 40–49.) Such an allegation is enough at this early juncture. *See In re Natera Prenatal Testing Litig.*, 664 F. Supp. 3d 995, 1012–13 (N.D. Cal. 2023) (denying motion to dismiss based on *Sonner* and holding "[p]laintiffs plead that they lack an adequate remedy at law. That is sufficient at this stage of the litigation.").

Without clearer direction from a higher court resolving this split, the Court will not deprive Plaintiff of her claims based purely on *Sonner*. *See Meltzer v. Mazda Motor of Am.*,

*Inc.*, 779 F. Supp. 3d 1120, 1135 (C.D. Cal. 2025). Of course, if it later becomes clear Plaintiff's legal remedies are indeed adequate, she will not be entitled to equitable or restitutionary remedies. *See Rabin*, 725 F. Supp. 3d at 1032 ("[T]he limits on federal courts' equitable jurisdiction impose an ongoing constraint"). Accordingly, the Court **DENIES** Defendant's motion to dismiss Plaintiff's equitable claims and remedies (Counts II, IV–VII).

**D. Breach of Express Warranty (Count III)**

Plaintiff plausibly pleads a claim for breach of express warranty under California law. California federal courts regularly find that stating a plausible claim under the California consumer protection statutes is also sufficient to state a claim for breach of express warranty. *See, e.g.*, *Legrand v. Abbott Lab'ys*, 655 F. Supp. 3d 871, 897 (N.D. Cal. 2023) ("[C]ourts in [the Northern District of California] regularly hold that stating a claim under California consumer protection statutes is sufficient to state a claim for [breach of] express warranty." (collecting authority)); *Wysocki v. Chobani, LLC*, 828 F. Supp. 3d 1061, 1083 (S.D. Cal. 2026) (denying motion to dismiss and holding that where Plaintiff plausibly pleads claims under California's consumer protection statute she also pleads a breach of express warranty claim); *James v. Chocmod USA Inc.*, 773 F. Supp. 3d 945, 961 (E.D. Cal. 2025) (same); *Robertson v. Clean Control Corp.*, No. 24-cv-01478-SSS-DTBx, 2024 WL 5193852, at *4 (C.D. Cal. Dec. 18, 2024) (same). Because the Court finds Plaintiff has plausibly pleaded her California consumer protection claims, it finds she has done the same for her breach of express warranty claim. Accordingly, Defendant's motion to dismiss the breach of express warranty claim (Count III) is **DENIED**.

**E. Federal Preemption**

Defendant's final argument claims Plaintiff's state law consumer protection claims are expressly preempted by the Federal Food, Drug, and Cosmetic Act ("FDCA"), as amended by the Nutrition Labeling and Education Act ("NLEA"). (*See* Mot. at 21–22.)

The Supremacy Clause of the United States Constitution empowers Congress to enact legislation that preempts state law. *See Gibbons v. Ogden*, 22 U.S. 1, 211 (1824) ("In

every such case, the act of Congress . . . is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it."). The Supreme Court instructs lower courts to "start with the assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *United States v. Locke*, 529 U.S. 89, 108 (2000). This presumption against preemption is heightened where "federal law is said to bar state action in fields of traditional state regulation." *See N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (citations omitted). Considering the "primacy of state regulation of matters of health and safety," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), courts can assume that "state and local regulation related to [such] matters . . . can normally coexist with federal regulations." *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 718 (1985). Even so, consumer protection laws like the UCL, FAL, and CLRA may be preempted where they seek to impose requirements contravening those set forth by federal law. *See In re Ferrero Litig.*, 794 F. Supp. 2d 1107, 1113 (S.D. Cal. 2011) (citing *Wyeth v. Levine*, 555 U.S. 555 (2009)). Where Congress does provide for express preemption, the presumption against preemption requires courts to read the clause narrowly. *See Medtronic*, 518 U.S. at 485.

The NLEA specifies it "shall not be construed to preempt any provision of State law, unless such provision is expressly preempted under [21 U.S.C. § 343-1(a)] of the [FDCA]." *In re Ferrero Litig.*, 794 F. Supp. 2d at 1113 (quoting Pub. L. No. 101-535, § 6(c)(1), 104 Stat. 2353, 2364). "Congress made clear that the preemptive scope of section 343-1 was to sweep no further than the plain language of the statute itself." *See In re Farm Raised Salmon Cases*, 42 Cal. 4th 1077, 1091 (2008).

The Court does not find Plaintiff's claims to be preempted by the NLEA. Federal law deems foods misbranded where "its labeling is false or misleading in any particular." 21 U.S.C. § 343(a)(1). California explicitly adopted this regulation in full. *See* Cal. Health & Safety Code § 110100(a) ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on

or after that date shall be the food labeling regulations of this state.”). Plaintiff argues she is merely holding Defendant to the federal nutritional labeling standards via her state law consumer claims. (*See* Opp’n at 23–24.) Defendant relies on the NLEA’s preemption provision, which bars states from imposing new or additional nutritional labeling requirements, to preempt Plaintiff’s claims. (*See* Mot. at 21) (citing 21 U.S.C. § 343-1(a)). The provision explicitly bars state regulation that is “not identical to” specific federal regulations. *See id.* However, 21 U.S.C. § 343(a)(1)’s ban on false or misleading food labels does not appear as one of the specific federal regulations Congress was careful to include within the scope of the preemption provision. Therefore, based on the plain language of the statute, Plaintiff’s claims—to the extent they allege Instinct’s labels are false or misleading—are not expressly preempted by the NLEA. *See Zeisel v. Diamond Foods, Inc.*, No. 10-01192 JSW, 2010 WL 9509506, at *2–3 (N.D. Cal. Sept. 3, 2010) (denying motion to dismiss and holding claims based on Section 343(a)’s “false or misleading” labels provision to fall outside the preemptive scope of Section 343-1(a)); *see also Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 370 (N.D. Cal. 2010) (“The express preemption provision of the FDCA contained in section 343-1 [] does not preempt the claims arising from false or misleading labels regulated by section 343(a).”). Thus, Plaintiff’s claims based on the false or misleading nature of Defendant’s labels are not expressly preempted.

Even if Plaintiff’s claims were potentially within the preemptive scope of Section 343-1, Plaintiff may nevertheless proceed with them because they appear to be parallel with federal standards. In reviewing Plaintiff’s prayer, the Court does not find she is asking the Court to add to, or otherwise alter, federal regulations on misbranded foods. (*See* FAC at 21–22.) Rather, Plaintiff uses state law consumer claims to hold Defendant to the requirements of federal law: namely, not printing false or misleading labels on the foods it puts into interstate commerce. *See* 21 U.S.C. § 343(a)(1); *cf. Reid v. Johnson & Johnson*, 780 F.3d 952, 959 (9th Cir. 2015) (“The NLEA does not preempt state law-based causes of action that are identical to the federal labeling requirements.” (citing *POM Wonderful*

*LLC v. Coca-Cola Co.*, 573 U.S. 102, 114 (2014))). In the cosmetics context, with nearly identical preemption and false labeling provisions of the FDCA, the Ninth Circuit considered a similar preemption argument. *See Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 757 (9th Cir. 2015). The court observed that, while the FDCA does bar states from imposing new or additional labeling requirements, the statute is nevertheless "silent with regards to states' ability to provide remedies for violations of federal law." *Id.* As a result, the court concluded the "FDCA does not preempt state laws that allow consumers to sue cosmetics manufacturers that label or package their products in violation of federal standards." *Id.* The same logic applies to Defendant's dog food Products. Plaintiff aims to use California consumer protection law to enforce federal standards proscribing false or misleading labels against Defendant's Products—that is not inconsistent with federal law.

Defendant's reliance on *Monsanto Co. v. Durnell* is misplaced. There, the court held that a state law failure-to-warn claim was expressly preempted under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") where it imposed a labeling requirement "in addition to or different from" the federal requirements laid out in FIFRA. *See Monsanto Co. v. Durnell*, 609 U.S. 371, 381–85 (2026). The *Durnell* court explained in dicta that refusing to preempt the plaintiff's claims would reverberate beyond FIFRA into other "federal statutes across a range of industries contain[ing] similar or identical labeling preemption provisions," explicitly naming the NLEA's food-labeling preemption clause, 21 U.S.C. § 343-1(a). *See id.* at 387. The plaintiff in *Durnell* asserted a failure-to-warn claim under Missouri law against Monsanto, claiming its Roundup products caused him to develop cancer and that it should have included a cancer warning on the products' labels. *Id.* at 381–82. Federal law required Monsanto to sell products, including Roundup, with a label approved by the federal Environmental Protection Agency ("EPA"). *Id.* at 385. The label approved (and re-approved multiple times) by the EPA came without a cancer warning. *Id.* The court found that using state law to require Monsanto to add a warning to a label approved by a federal agency multiple times (as mandated by federal law) would

add to or otherwise alter Monsanto's federal labeling obligations. *See id.* Consequently, FIFRA expressly preempted the plaintiff's state law claim. *Id.* at 395.

This case, however, does not impinge on the uniformity in food labeling the NLEA seeks to establish. None of the issues that sank the *Durnell* plaintiff's claims are present here. No federal agency appears to have weighed in on Instinct's labels. Nothing on the face of the FAC indicates Plaintiff is using California state law to add to or change federal labeling requirements in the mold of the *Durnell* plaintiff. As stated, Plaintiff's claims instead seek to use California law to enforce the federal proscription of false or misleading food labels. Therefore, Plaintiff's state law claims may proceed. Defendant's motion to dismiss on preemption grounds is **DENIED**.[6]

## IV. CONCLUSION

For the reasons set forth above, the Court **DENIES** Defendant's motion to dismiss (ECF No. 23) in its entirety.

**IT IS SO ORDERED.**

**DATED: November 9, 2026**

**Hon. Cynthia Bashant, Chief Judge**
**United States District Court**

[6] "Federal preemption is an affirmative defense upon which defendant bears the burden of proof." *See Loomis v. Slendertone Distribution, Inc.*, 420 F. Supp. 3d 1046, 1073 (S.D. Cal. 2019) (citation modified). The denial is without prejudice to raising the same defense in a later stage of this litigation on a more factually developed record.